894 P.2d 715

**Jeffrey L. LATHROP, D.C.,**
**Plaintiff–Appellant,**

v.

**ARIZONA BOARD OF CHIROPRACTIC EXAMINERS, Defendant–Appellee.**

No. 1 CA–CV 93–0310.

Court of Appeals of Arizona,
Division 1, Department B.

March 14, 1995.

Redesignated as Opinion and
Publication Ordered April 25, 1995.

Gregory G. McGill, P.C. by Gregory G. McGill, Scottsdale, for plaintiff-appellant.

Grand Woods, Atty. Gen. by Montgomery Lee, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

EHRLICH, Judge.

Jeffrey Lathrop appeals from the superior court's order affirming the revocation of his chiropractic license by the Arizona State Board of Chiropractic Examiners ("Board"). For the reasons which follow, we affirm the judgment.

*FACTS AND PROCEDURAL HISTORY*

In 1988, Lathrop obtained a chiropractic license in Arizona. The following year, he was hired by American Clinics Corrective Chiropractic ("American Clinics") to operate one of their offices. In conjunction with its chiropractic services, American Clinics performed and advertised on television a weight-loss service referred to as Doctor's Choice Weight Loss Center ("Doctor's Choice").

On August 22, 1991, the Board issued a complaint against Lathrop in which it alleged violations of the Chiropractic Act. *See* Ariz. Rev.Stat.Ann. ("A.R.S.") §§ 32–900 through –930. Specifically, the Board charged Lathrop with five counts of unprofessional conduct of a character likely to deceive or defraud the public or tending to discredit the profession, A.R.S. § 32–924(A)(5), and five counts of conduct or practice contrary to recognized standards of ethics in chiropractic or which constitutes a danger to the health, welfare or safety of the patient or the public, or which impairs the

ability of the licensee to safely and skillfully practice chiropractic. A.R.S. § 32–924(A)(15).[1] All of the counts arose out of Lathrop's treatment of two individuals identified as N.C. and C.C.

Lathrop first saw N.C. on May 23, 1990, when she came to his office for the sole purpose of losing weight. After a brief initial consultation with Lathrop, N.C. returned for a cursory physical examination and cervical x-rays. During that second visit, Lathrop discussed with N.C. the possibility that she could have a thyroid condition which was preventing her from losing weight. Lathrop placed her on the Doctor's Choice liquid diet. On N.C.'s third visit, after purportedly comparing her films with those of a person with perfect cervical alignment, Lathrop concluded that, with proper alignment, her thyroid would begin functioning correctly and she would lose weight. On N.C.'s fourth visit, Lathrop took a series of lumbar x-rays and informed N.C. that he could identify her endometriosis on these films.[2] Lathrop indicated to N.C. that her treatment would be covered by her insurance.

On July 16, 1990, C.C.[3] went to Doctor's Choice with the apparent intent of enrolling in the weight-loss program. After briefly consulting with C.C., and without physical examination, Lathrop concluded that C.C.'s thyroid gland was the cause of his obesity and that he could help C.C. lose weight by manipulating his body and with liquid products. Lathrop also indicated to C.C. that his treatment would be covered by insurance and asked him to return to the office the next day for x-rays.

At the hearing on the complaint, the Board

1. The violations were alleged to be of A.R.S. sections 32–924(A)(6) and 32–924(A)(16). However, effective September 27, 1990, subsection 6 was renumbered subsection 5 without other change and subsection 16 was renumbered subsection 15 without other change. Laws 1990, Ch. 175, § 9. Accordingly, references to these sections are to the current numbers.

2. As the Board's expert chiropractor testified, endometriosis is "a proliferation of the lining of the uterus that disperses itself through the pelvic cavity through some pathological process. And then as the female's hormone levels change, that

endometrial tissue responds to that and swells and causes a lot [of] pain and a lot of scarring and fibrosis in the pelvis." At her initial consultation, N.C. had informed Lathrop that she had been diagnosed with this condition and that she had associated lower-back pain. She also had told Lathrop that her condition was being treated by a physician with the Mayo Clinic and that she was satisfied with the doctor's treatment.

3. C.C., a reporter, visited Lathrop's office as part of a local television station's undercover investigation of weight-loss programs.

heard testimony from N.C.,[4] C.C., Arthur J. Mollen, D.O., Lathrop, defense expert chiropractors Pierre Beaulieu and James Brewer, and the Board's expert chiropractor M. Brent Peugnet.

At the conclusion of the hearing, the Board adopted findings of fact and conclusions of law, and voted to revoke Lathrop's license. In its formal order of May 12, 1992, the Board included the following pertinent findings:

(5) Persons desiring to lose weight responded to weight reduction advertisements placed by American Clinics and Doctor's Choice and came to the aforementioned address seeking medical attention appropriate to safe, effective weight loss. These persons were x-rayed on the pretext of Lathrop's purported ability to diagnose metabolic abnormalities, specifically thyroid dysfunctions, through the use of routine chiropractic x-rays.

(6) In point of fact and unbeknownst to those persons seeking weight loss treatment at Doctor's Choice, the purpose of the x-rays taken by Lathrop was to establish a basis by which insurance companies could be induced to pay for routine chiropractic therapy which would have no direct bearing or effect upon weight loss.

(7) Persons desiring to participate in the Doctor's Choice weight loss program were accepted for treatment without the benefit of an adequate physical examination being given to determine the propriety of the Doctor's Choice program for the individual person seeking treatment.

(8) On or about May 23, 1991, patient N.C., chiropractically asymptomatic, went to Doctor's Choice with the intent of enrolling and participating in the Doctor's Choice weight loss program for the sole purpose of losing weight. After a brief, initial visit at which time Lathrop discussed the diet program, patient N.C. returned to Doctor's Choice for a series of x-rays. Subsequently, on patient N.C.'s third visit to Doctor's Choice, Lathrop, through the use of the aforementioned x-rays, diagnosed patient N.C. as having thyroid disease. Thyroid disease cannot be determined through the use of routine x-rays. [F]urther, x-rays should not be taken unless the benefits of the x-ray exposure outweigh the risks of x-ray exposure.

(9) In point of fact, the purpose of the x-rays taken of patient N.C. by Lathrop was to establish a basis by which insurance companies could be induced to pay for routine chiropractic therapy which would have no direct bearing or effect upon patient N.C. losing weight.

(10) Patient N.C. informed Lathrop that she was suffering from endometriosis. Lathrop stated that he was able to identify this condition on her routine x-rays and that he would be able to treat this condition chiropractically. Endometriosis cannot be determined through the use of routine x-rays.

(11) On the same day as Lathrop performed the x-rays on patient N.C., he also performed a cursory physical examination which was inadequate to determine the propriety of the Doctor's Choice weight loss program for patient N.C.

(12) On or about July 16, 1990, C.C., an undercover investigator for Channel 10 news, went to Doctor's Choice with the apparent intent of enrolling and participating in the Doctor's Choice weight loss program as a patient. At the initial visit, Lathrop performed a consultation which was inadequate to determine the propriety of the Doctor's Choice weight loss program for patient C.C.

(13) At that consultation, C.C. stated that "He (Lathrop) explained that he was a chiropractor and that people like me were suffering from a disease of, I believe, the thyroid gland, and that the reason that I was overweight was because of my thyroid and that he could help me lose weight by manipulation on my body and he could speed up the process as well with some shake product that they had." (from transcript page 31.) No scientific evidence

exists to support the visual diagnosis of a thyroid disease.

The Board concluded that the conduct described in paragraphs 8 through 13 constituted violations of section 32–924(A)(5) and that the conduct detailed in paragraphs 8 through 12 constituted violations of section 32–924(A)(15).

After unsuccessfully moving for rehearing, Lathrop sought judicial review of the Board's decision in the superior court. *See* A.R.S. § 12–901 *et seq.* After written and oral arguments, the superior court found that the Board's decision was not arbitrary or capricious and was supported by substantial evidence. Accordingly, it entered formal judgment affirming the revocation of Lathrop's license. Lathrop timely appealed, raising the following issues:

1. Whether the record supports the Board's findings of fact and conclusions of law that Lathrop engaged in unprofessional conduct in violation of section 32–924(A)(5) and in conduct which constituted a danger to the health, welfare or safety of a patient in violation of section 32–924(A)(15);

2. whether the Board's revocation of Lathrop's license was an excessive penalty;

3. whether the Board was biased and prejudiced against Lathrop;

4. whether the 18–month lapse between Lathrop's alleged misconduct and the Board's adjudication was prejudicial;

5. whether the Board abused its discretion in allowing one of the state's experts to offer expert testimony;

6. whether Lathrop was prejudiced by the admission of the videotape of a local television station's newscast;

7. whether the Board erred in quashing the subpoena directing a reporter to testify; and

8. whether Lathrop was denied due process because the state did not compel expert testimony from one of his witnesses.

### DISCUSSION

█ On appeal from the superior court's review of an administrative decision, we must determine whether the record supports that court's judgment. *E.g., Samaritan Health Services v. Ariz. Health Care Cost Containment System Admin.*, 178 Ariz. 534, 537, 875 P.2d 193, 196 (App.1994).[5] Thus, we must consider, as the superior court did, whether the agency's action was illegal, arbitrary, capricious or an abuse of discretion. *Id.*

#### 1. Sufficiency of the Evidence

The Board determined that, with respect to N.C. and C.C., Lathrop's conduct violated A.R.S. sections 32–924(A)(5) and (15) which provide:

(A) The board may issue an order of censure and impose a civil penalty of not more than five hundred dollars or may prescribe probation, or may refuse to issue a license to an applicant, or may revoke or suspend a license, after a hearing, upon any of the following grounds whether occurring in this state or elsewhere:

\* \* \* \* \* \*

(5) Unprofessional or dishonorable conduct of a character likely to deceive or defraud

---

5. For this purpose, the record is defined as all evidence received and considered, including the transcript of the administrative hearing. *Schmitz v. Ariz. State Bd. of Dental Examiners*, 141 Ariz. 37, 40, 684 P.2d 918, 921 (App.1984). *See also* A.R.S. § 41–1061(E); Ariz. R. Civ.App. P. 11(a)(1), (b). We note, however, that Lathrop failed to include in the appellate record the administrative record and the hearing transcripts. After Lathrop filed his reply brief, the Board requested to supplement the record on appeal; Lathrop did not respond. Considering that Lathrop's principal issue is that the Board's decision was not supported by the record, it is confounding that Lathrop failed to insure that such items were included on appeal. Although it was not the Board's burden to provide support for a full consideration of the issues raised by Lathrop, this court, in the exercise of its discretion, granted the motion. Consequently, in preparation for deciding this appeal, we also have reviewed the administrative record and hearing transcripts.

Additionally, in his opening brief, Lathrop provided only sporadic and incomplete citations to the administrative record and hearing transcripts in violation of Ariz.R.Civ.App. P. 13(a)(4), (6). The reply brief also is deficient. Counsel is admonished to comply with the rules of this court in the future.

the public or tending to discredit the profession.

\*　　\*　　\*　　\*　　\*　　\*

(15) Any conduct or practice contrary to recognized standards of ethics in chiropractic or any conduct or practice which constitutes a danger to the health, welfare or safety of the patient or the public or any conduct, practice or condition which impairs the ability of the licensee to safely and skillfully practice chiropractic.

Lathrop first argues that the term "unprofessional conduct" as it appears in subsection (A)(5) is only defined in Arizona Administrative Code ("A.A.C.") Rule R4–7–901, which pertains to deceptive and fraudulent advertising. He asserts accordingly that, because the Board did not charge him with false advertising nor have evidence that he participated in such conduct, and because it lacked evidence that he "played a role in deceiving or defrauding the public," the Board's finding that he violated section 32–924(A)(5) was arbitrary and capricious.

■ Rule R4–7–901 does not restrict the definition of "unprofessional conduct" within section 32–924(A)(5). Instead, R4–7–901 interprets another subsection of that statute which prohibits a chiropractor from "[a]dvertising in a false, deceptive or misleading manner." *Cf.* A.R.S. § 32–924(A)(13). The Board need not have found that Lathrop falsely advertised to have concluded that his conduct was unprofessional.

■ The term "unprofessional conduct" is described by statute as "character likely to deceive or defraud the public or tending to discredit the profession." A.R.S. § 32–924(A)(5). The statute is not unconstitutionally vague, as Lathrop summarily asserts, because it contains standards by which the Board may assess his professional conduct. *See Caldwell v. Ariz. State Bd. of Dental Examiners,* 137 Ariz. 396, 399, 670 P.2d 1220, 1223 (App.1983) (adoption of standards not required because standards of practice adequately enumerated and defined by statute); *Athans v. Ariz. State Bd. of Dental Examiners,* 126 Ariz. 6, 7, 612 P.2d 57, 58 (App.1980) (despite lack of ethical code, board may discipline licensee for conduct specifically proscribed by statute).

■ Regarding Lathrop's alleged deceptive or fraudulent conduct, the Board found that, by using routine chiropractic x-rays, Lathrop diagnosed N.C. with thyroid disease and that such a disorder cannot be established by this method. The Board correspondingly found that the x-rays were used to induce insurance companies to pay for routine chiropractic care unrelated to the weight-loss treatment that N.C. sought. The Board found further deceptive conduct when Lathrop informed N.C. that he could identify by x-rays her endometriosis and that it could be treated chiropractically. Additionally, the Board concluded that Lathrop used inadequate methods to determine whether N.C. and C.C. were candidates for the Doctor's Choice weight-loss program and that no scientific evidence supported his visual diagnosis of C.C.'s purported thyroid disease.

At the administrative hearing, Peugnet testified that thyroid disease cannot be detected by x-ray, as Lathrop did with N.C., nor by visual means, as Lathrop did in C.C.'s case. Similarly, Peugnet asserted that endometriosis could not be confirmed by x-ray. Lathrop's expert, Beaulieu, concurred with these opinions. Peugnet further stated that chiropractic is not a proven treatment for weight loss and that there was no need to x-ray a patient coming solely for this purpose. Beaulieu concurred with this judgment also. In addition, based on N.C.'s testimony and a review of her chiropractic records, Peugnet concluded that Lathrop's pre-diet work-up of N.C. was inadequate. Likewise, he opined that Lathrop lacked a basis for determining if C.C. should participate in the program given the lack of a physical examination. Further, N.C. and C.C. testified that Lathrop had told them that their weight-loss treatment would be covered by their insurance plans. Indeed, Lathrop never billed N.C. nor her insurance company for such treatment; he only billed for chiropractic treatment.[6] This evidence supports the Board's

---

6. Lathrop did not have an opportunity to bill C.C. for any services because C.C. did not return after the initial consultation.

findings, which in turn support its conclusion that Lathrop had engaged in "unprofessional or dishonorable conduct of a character likely to deceive or defraud the public."

■ Lathrop next asserts that the record fails to support the Board's finding that he violated section 32–924(A)(15) because the state did not establish that his conduct constituted a danger to N.C.'s or C.C.'s health, welfare or safety, and that the Board's delay in rendering its decision without a specific finding that the decision must be effective immediately, *see* A.A.C. R4–7–305(G), contradicted such a threat.[7] Again, Lathrop's assertion is contradicted by the record.

At the administrative hearing, Peugnet and Beaulieu testified that there was no justification to x-ray a patient who came solely for weight loss as N.C. and C.C. testified they had. Peugnet added that unnecessary x-rays needlessly expose a patient to hazardous ionizing radiation. In addition, based on N.C.'s testimony and a review of her chiropractic records, Peugnet concluded that Lathrop's pre-diet work-up of N.C. was inadequate. Likewise, he opined that Lathrop lacked a basis for determining whether C.C. should participate in the weight-loss program given the lack of a physical examination. This evidence supports the Board's finding that Lathrop took unnecessary x-rays of N.C. and had not given either N.C. or C.C. an adequate examination before agreeing to place them on the Doctor's Choice regimen.

### 2. License Revocation as an Excessive Penalty

■ Lathrop next asserts that the revocation of his chiropractic license was such an excessive penalty under the circumstances that it constituted an abuse of the Board's discretion. Stressing the severity of license revocation, he claims that he merely was complying with the management policies of the practice and cites the lack of injury to any patient, his previously unblemished disciplinary record, his avowed lack of a dishonest or selfish motive and his professional inexperience. He also contends that more egregious conduct by other licensed professionals resulted in less-severe sanctions, relying on *In the Matter of Wickman*, 138 Ariz. 337, 674 P.2d 891 (App.1983), and *In the Matter of Levine*, 174 Ariz. 146, 847 P.2d 1093 (1993).[8]

■ "[A]n administrative penalty is excessive only if it is so disproportionate to the offense as to shock one's sense of fairness." *Schillerstrom v. State*, 180 Ariz. 468, 471, 885 P.2d 156, 159 (App.1994) (citing *Bear v. Nicholls*, 142 Ariz. 560, 563, 691 P.2d 326, 329 (App.1984)). We will not disturb the penalty imposed by an administrative body unless there has been a clear abuse of discretion. *Taylor v. Ariz. Law Enforcement Merit System Council*, 152 Ariz. 200, 207, 731 P.2d 95, 102 (App.1986).

In *Schillerstrom*, the Board revoked a chiropractor's license for falsely billing insurance companies for treatments he had not rendered. The superior court vacated the revocation as excessive and remanded for a reconsideration of the appropriate remedial action. On review, this court found that the sanction imposed did not shock the conscience and directed the entry of judgment affirming the revocation.

■ Under the Chiropractic Act, license revocation is a permissible sanction for even a *single* statutory violation. *See* A.R.S. 32–924(A). Here, as in *Schillerstrom*, the Board found *multiple* instances in which Lathrop had engaged in similar unprofessional conduct, which, in this decision, we find to be supported by substantial evidence. *See also Kaplan v. Dept. of Registration and Education*, 46 Ill.App.3d 968, 5 Ill.Dec. 303, 361

---

7. Lathrop also argues that the Board could not find that he violated this statutory provision because the state did not introduce any evidence that his conduct was contrary to any " 'recognized standards of ethics in chiropractic.' " However, the statute is in the disjunctive and it is complete in precluding "any conduct or practice which constitutes a danger to the health, welfare or safety of the patient or the public." A.R.S. § 32–924(A)(15).

8. Lathrop also cites a recent minute entry by the superior court reviewing the penalty imposed by the Board for the misconduct of one of Lathrop's colleagues. The record of any action by the superior court unrelated to the underlying action is of no determinative value to this court.

N.E.2d 626 (1977) (revocation of medical license upheld for doctor's filing false accident claims for false victims). In addition, despite Lathrop's urging that no patient sustained actual injury, the Board properly found that Lathrop's conduct endangered a patient's health, welfare or safety.

Lathrop's reliance on *Wickman* and *Levine* to support his claim that revocation was disproportionate is misplaced. In *Wickman*, 138 Ariz. 337, 674 P.2d 891, this court never addressed whether the administrative penalty imposed on the osteopath was excessive. Thus, this opinion provides no guidance as to the propriety of Lathrop's discipline. The other case, *Levine*, 174 Ariz. 146, 149, 847 P.2d 1093, 1096, is likewise inapplicable because, unlike this court's purpose on review in this type of case, the Arizona Supreme Court is an independent trier-of-fact in attorney-discipline matters. Thus, neither case alters our conclusion that the Board did not abuse its disciplinary discretion.

Lathrop's remaining contentions about the penalty are equally unpersuasive. Regarding his assertion that there was no pattern of misconduct, the Board found similar misconduct by Lathrop with respect to two individuals. Lathrop also attempts to shift responsibility onto the owners of American Clinics, arguing that, by "merely" following office policies, he was not the one with a selfish or dishonest motive. Lathrop may not allow his employers' orders to supersede his duties as a licensed chiropractor. As a doctor of chiropractic, he has a duty to perform at the competency and ethical levels required by statute or risk facing various penalties, including the loss of his license. Therefore, because the sanction imposed on Lathrop falls within the range of the Board's remedial options and does not shock the sense of fairness, the revocation of Lathrop's chiropractic license was not an abuse of discretion.

### 3. Evidence of the Board's Bias and Prejudice

■ Lathrop claims that the administrative hearing was prejudiced by evidence relating to the advertising and marketing tactics of his employers. He argues that his license revocation was, in large part, the consequence of the Board's reaction to such tactics. He similarly maintains that he was prejudiced by the contemporaneous hearings of two chiropractors who also were employed by American Clinics. Without support, he suggests that, once the Board had revoked their licenses, it simply followed the built-up "momentum" and took the same action against his license. Again, we disagree.

The Board never charged Lathrop with any advertising violations. *Cf.* A.R.S. § 32–924(A)(13). The only evidence regarding American Clinics' advertising practices was offered to establish the manner in which N.C. and C.C. learned of the weight-loss program and to corroborate their testimony that, when they contacted Lathrop, they were seeking weight-loss services. In addition, Lathrop stated that he was not responsible for advertising and that he opposed the advertisement of chiropractic services.[9]

■ The record also rebuts Lathrop's contention that the Board's proceedings concerning other chiropractors prejudiced his case. The Board, in reaching its decision in Lathrop's case, focused on Lathrop's treatment of N.C. and C.C. There is no indication that it confused Lathrop's case with other proceedings or that it was predisposed to rule against him. Without a showing of actual bias or prejudice, the members of the Board are presumed to be fair. *See Maxwell v. Civil Service Comm'n*, 146 Ariz. 524, 526, 707 P.2d 322, 324 (App.1985).

### 4. Delay in Proceedings

■ Lathrop contends that the 18–month delay between the time of his alleged misconduct and the Board's adjudication prejudiced his case because it adversely affected the parties' abilities to recall events and testify accurately. Again, the record does not sup-

---

9. For reasons which are not clear, in this context Lathrop makes a passing reference to the Board's query of American Clinics' billing practices, claiming that the admission of such evidence was irrelevant. While very little evidence was introduced on this issue, the evidence that was offered was relevant to his treatment of N.C. and whether Lathrop was incorporating his charges for weight-loss services with those for chiropractic treatment.

port his contention. None of the witnesses alleged that they had difficulty remembering the pertinent events. In fact, Lathrop was particularly certain that he could recall the date of specific chiropractic findings he had made concerning N.C. Therefore, he has not demonstrated that the delay was excessive or that it had a prejudicial impact on the proceedings.

### 5. Peugnet as an Expert

■ Lathrop is dissatisfied that the Board permitted Peugnet to offer expert testimony. Correspondingly, he urges us to find that the Board abused its discretion by placing a disproportionate amount of weight on Peugnet's testimony while rejecting the testimony of one of his experts, Brewer.

■ The Board, in conducting the hearing, is not limited by the evidentiary rules which govern judicial proceedings. A.R.S. § 41–1062(A)(1). Therefore, it has exceptional discretion to determine whether a witness may provide expert testimony. Cf. Lay v. City of Mesa, 168 Ariz. 552, 554, 815 P.2d 921, 923 (App.1991); Ariz. R. Evid. 702. Even if it did not have such leeway, generally a witness is competent to testify as an expert if he possesses training and experience qualifying him to render opinions which will be useful to the trier-of-fact, id., in this case, the Board. Therefore, because Peugnet is a licensed chiropractor who, at the time of the hearing, had been in practice for more than six years, we find no abuse of the Board's discretion in allowing his testimony concerning chiropractic treatment.

■ As for the Board's decision to give Peugnet's testimony more weight than Brewer's, we similarly find no error. It is the Board's prerogative, as the trier-of-fact, to assess the credibility of witnesses. See Anamax Mining Co. v. ADES, 147 Ariz. 482, 486, 711 P.2d 621, 625 (App.1985) (credibility of witnesses is matter peculiarly within province of trier-of-fact in administrative matter). This principle is particularly fitting when, as in the present matter, three members of the Board are licensed, experienced chiropractors who could rely on their own expertise in resolving the medical issues in the case. A.R.S. § 41–1062(A)(3); see Croft v. Ariz. State Bd. of Dental Examiners, 157 Ariz.

203, 209, 755 P.2d 1191, 1197 (App.1988) (dental board could rely on its expertise in determining the standard of care required for dental work that was the subject of disciplinary action). In fact, one of the Board members expressly found that Brewer's testimony lacked credibility.

### 6. The Newscast Videotape

■ At the hearing, the Board twice viewed a videotape of a television station's segment on the Doctor's Choice weight-loss program—first at the state's request without objection and then at Lathrop's. The videotape included an edited version of C.C.'s consultation with Lathrop. Lathrop argues that the edited recording was prejudicial because it took his statements out of context and placed him in a false light.

■ Lathrop has waived his claim of prejudice because he did not object to the state's request to admit the videotape. E.g., Rouse v. Scottsdale Unified School Dist., 156 Ariz. 369, 371, 752 P.2d 22, 24 (App.1987) (failure to raise issue before administrative tribunal constitutes waiver). Moreover, he later asked the Board to review the tape. See Wadin v. Czuczka, 16 Ariz. 371, 377, 146 P. 491, 497 (1915) (party cannot complain of evidence he elicited). While C.C. believed that the edited product adequately and accurately reflected his visit with Lathrop, the Board's deliberations demonstrate that it placed very little, if any, stock in this tape. Instead, the Board relied on C.C.'s testimony, as well as other evidence, in rendering its decision. Accordingly, the record does not support Lathrop's contention that he was prejudiced.

■ Also regarding C.C., Lathrop raises a tangential concern that he was denied due process because the Board had amended its complaint and he did not have an opportunity to respond. In its complaint, the Board charged in pertinent part that "[o]n or about July 16, 1990, patient C.C. went to Doctor's Choice with the apparent intent of enrolling and participating in the Doctor's Choice weight loss program" and that Lathrop's cursory physical examination of C.C. was inadequate to determine whether the program was appropriate. During the Board's post-hearing deliberations, a Board member chal-

lenged the propriety of including this charge in the factual findings and legal conclusions because C.C. had no "apparent intent" to enroll in the weight-loss program. After discussion, the Board's related factual finding described C.C. as an "undercover investigator for Channel 10 news."

"Pleadings before an administrative agency are liberally construed and there may be no subsequent challenge of an issue which was actually litigated if there has been reasonable notice and an opportunity to cure surprise." *Berenter v. Gallinger*, 173 Ariz. 75, 83, 839 P.2d 1120, 1128 (App.1992). While the Board's complaint referred to C.C. as a "patient," it adequately notified Lathrop that he was being investigated for his treatment of this individual. Further, at the hearing, Lathrop was provided an adequate opportunity to interrogate C.C. regarding his role in obtaining weight-loss treatment. Thus, Lathrop's apparent claim that he was sanctioned for conduct which was not addressed by the Board's complaint is without merit.

### 7. Quashing of Subpoena

Lathrop next submits that the Board violated section 12–2214 when it quashed the subpoena for the attendance at the hearing of the television reporter who had initiated the story on Doctor's Choice.[10] He maintains that he wished to ascertain from the reporter why portions of the videotape were not aired, along with the station's reason for discarding the tape. We find no merit in Lathrop's argument.

At the administrative hearing, C.C. testified that portions of the tape had been edited, possibly in the interest of time. He also stated that, as was common industry practice, the unedited tape had been "recycled," that is recorded over with other stories. In fact, while later arguing the fate of the subpoena, Lathrop's counsel recognized that C.C. previously had testified that the tape had been discarded. Accordingly, the information Lathrop sought from the reporter already had been offered by C.C. and there

was no reason for the reporter to have appeared.

### 8. Mollen's Refusal to Testify

Finally, Lathrop claims that the Board violated his due-process rights when it would not compel Mollen, an osteopath, to provide expert testimony. Lathrop accordingly asserts that he was precluded from "effectively cross-examining" Mollen about the weight-loss television segment. Again we find no error.

Lathrop unequivocally indicated at the outset of Mollen's testimony that Mollen was not subpoenaed as an expert. Lathrop wished to question Mollen about his involvement in the television station's report on Doctor's Choice.[11] Mollen appeared at the hearing and Lathrop questioned him about the news account. However, at one point during direct examination, Lathrop's counsel attempted to pose to Mollen various expert hypotheticals. Mollen protested that he had not been called as an expert witness and that he was not being compensated as such. The Board instructed Lathrop's counsel to adhere to the factual issues.

As noted above, because Lathrop designated Mollen as a fact witness, not an expert, he was not entitled to present Mollen with expert hypotheticals. Mollen merely was required to respond to Lathrop's factual questions regarding the television segment. Therefore, the Board's refusal to permit Mollen to offer expert testimony did not affect Lathrop's ability to examine Mollen about the television segment on Doctor's Choice.

### CONCLUSION

For the foregoing reasons, we affirm the Board's revocation of Lathrop's chiropractic license.

LANKFORD, P.J., and TOCI, J., concur.

---

**10.** Section 12–2214(A) enumerates the requirements for the issuance of a subpoena to secure the attendance of a media witness. The Board quashed the subpoena after the reporter objected that it sought information which was unavailable, irrelevant or available from other sources. *See* A.R.S. § 12–2214(A)(4).

**11.** Mollen was interviewed about the weight-loss program during the segment.