59 P.3d 830

**PEEPLES, INC., Plaintiff–Appellant,**

v.

**ARIZONA STATE LAND DEPARTMENT, ex rel., Michael E. ANABLE, Commissioner, Defendants–Appellees.**

**No. 1 CA–CV 02–0408.**

Court of Appeals of Arizona, Division 1, Department E.

Dec. 24, 2002.

Gust Rosenfeld, P.L.C. by Jerry L. Haggard, James G. Speer, Phoenix, Attorneys for Appellant.

Janet Napolitano, Attorney General by Theresa M. Craig, Assistant Attorney General, Phoenix, Attorneys for Appellees.

Twitty, Sievwright & Mills by Ralph B. Sievwright, John F. Mills, Phoenix, Attorneys for Arizona Mining Association, Amicus.

## OPINION

PATTERSON, Judge.

¶ 1 Peeples, Inc. ("Peeples") appeals from the trial court order affirming the Arizona State Land Department's ("Department") disapproval of its plans of operation under a Mineral Lease (or "Lease"). The plans of operation sought to reprocess the tailings[1] left from a former mining operation in an effort to produce additional "leasable minerals"[2] from those tailings. The Department concluded that the plans of operation sought

---

1. Tailings are material that was discarded into ponds during the prior mining of the land.

2. Leasable minerals are metallic ore minerals and industrial minerals other than "common variety minerals." Ariz.Rev.Stat. ("A.R.S.") § 27–231 (1999). "Common variety minerals" include, among other things, sand, gravel, and waste rock. A.R.S. § 27–271 (1999). The De-partment may lease state trust lands for the mining of both types of minerals but such leases are subject to different terms and governed by different statutory schemes. *See* A.R.S. §§ 27–231 to –239 (governing leasable minerals); A.R.S. §§ 27–271 to –276 (governing common variety minerals). The Lease at issue allowed the mining of leasable minerals only.

to mine "common variety minerals" that were not subject to the Mineral Lease. For the reasons discussed, we reverse the trial court's affirmance of the Department's decision and remand for entry of judgment in favor of Peeples.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Pursuant to the Arizona–New Mexico Enabling Act,[3] Arizona holds approximately ten million acres of land in trust for the support of schools and other public institutions. Ariz. Const. art. 10; *Kadish,* 155 Ariz. at 486, 747 P.2d at 1185. These lands "shall not be sold or leased in whole or in part, except to the highest and best bidder at a public auction...." Ariz. Const. art. 10, § 3. State trust lands may be leased "for mineral purposes, other than for the exploration, development, and production of oil, gas and other hydrocarbon substances, for a term of twenty years or less." Ariz. Const. art 10, § 3.2.

¶ 3 The Mineral Lease at issue provides for the mining of metallic ore minerals such as gold, silver, copper and platinum group metals. A.R.S. § 27–231. It does not apply to common variety minerals, such as sand, gravel and waste rock. A.R.S. §§ 27–231, –271.

¶ 4 The Lease was originally issued in 1983 to Arnold Spielman and Eugene Bender under statutes that required discovery of a "valuable mineral deposit" as a prerequisite to issuance of the lease. *See* former A.R.S. §§ 27–231(A), –233(A), amended by Laws 1998, Ch. 133, §§ 2, 3 and now codified at A.R.S. § 27–254 (1999). Hence, before issuing the Lease, the Department conducted a field examination, and a sampling and assaying of mineral values of the encompassed

land, and concluded that a valuable mineral deposit (i.e., a sufficient gold content) existed on the land to support the Lease. The Department subsequently issued the Mineral Lease on May 2, 1983, for a term of twenty years. The Lease provides the lessee with the rights to "extract and ship minerals, mineral compounds and mineral aggregates" from the land during the twenty-year term.

¶ 5 The Lease requires the submission of "a plan outlining the proposed operations and the measures to be taken to reasonably protect the environment from adverse effects probable under such operations" to the Department "before initializing exploration, development, or mining operations on the leased premises." In accordance, the lessees submitted the requisite plan of operation, mined the land, and processed approximately 123,000 tons of material. From that material, the original lessees extracted about 688 ounces of gold valued at more than $308,000. The discarded material from the mining operation was discharged into "tailings ponds."

¶ 6 The original lessees subcontracted the Mineral Lease to Peeples on May 11, 1992. Peeples submitted plans of operation to the Department in 1992, 1996, and 2000, each seeking approval to reprocess the material in the tailings ponds to produce additional leasable minerals by using more efficient mining equipment than was used in the former operation.

¶ 7 In 1998, A.R.S. § 27–235 was amended to provide for the approval of the lessee's general mining plan by the State Land Commissioner before operations could be carried out. *See* Laws 1998, Ch. 133, § 5. Until the Department adopted formal rules governing the general mining plans required under the new amendment, the Session Law sets forth interim requirements.[4] The 2000 plan of op-

---

3. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557. The Enabling Act authorized the people of the territories of Arizona and New Mexico to form state governments. *Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987), *aff'd by ASARCO Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). The Act included provisions that confirmed prior land grants to the Arizona Territory and granted additional land to the new state. *Id.* In 1911, the Arizona electorate accepted the land grants by ratifying art. 10, § 1 of the

Arizona Constitution, and the full provisions of the Enabling Act became "part of the organic law of this state." *Id.*

4. Laws 1998, Ch. 133, § 24, *See* Historical Note to A.R.S. § 27–235 (1999), provides that the Department:

> may require some or all of the following components, or their substantial equivalents, to be included in a general mining plan for the lands covered by the lease:

eration contained all of the information required under the Session Law.

¶ 8 During this 1992 to 2000 period, the Department indicated several times that it would need testing to consider the proposal. The Department eventually conducted a site visit and took samples from drums containing material from the tailings ponds, as well as from a bucket of processed material. Peeples' representatives took samples on the same date from the same drums as the Department.

¶ 9 The Department had its samples assayed using standard techniques. The assays indicated platinum in only trace amounts and gold averaging .005 ounces per ton (as opposed to the 1983 pre-mining assays indicating gold of .02 ounces per ton). The Department's assay results indicated that the operation to extract gold and platinum from the tailings would not be profitable.

¶ 10 On September 1, 2000, the Department sent a letter to Peeples disapproving the plans of operation and advising that it intended to cancel the Lease. Thereafter, the Commissioner issued an order disapproving the 1992, 1996 and 2000 plans of operation stating:

> The plans of operation propose mining tailings which contain no economically recoverable mineral values and pursuant to A.R.S. § 27–271 are common variety minerals not subject to disposal under Mineral Lease Agreement 11–86475 and state law. The plans of operation propose activities that do not comport with the law, and therefore, should not be approved. Additionally, it is not in the best interests of the Trust to approve the June 7, 2000, plan that indicates mineral values the Department is unable to confirm.

The order listed three additional reasons for denying the plans of operation, and ordered the Lease cancelled on all four grounds.

¶ 11 Peeples appealed the order to the Office of Administrative Hearings. An Administrative Law Judge ("ALJ") held that the Department had no authority to cancel the Lease for any of the four grounds asserted. The ALJ further rejected three of the Department's four reasons for disapproving the plans of operation, but acknowledged the Department could disapprove the plans for the reason quoted above. The Department adopted the ALJ's recommendation to deny approval of the plans of operation based on that ground.

¶ 12 Peeples sought judicial review of the Department's decision in Maricopa County Superior Court. The superior court affirmed the Department's decision, holding:

> The lease does not give the leaseholder permission to mine common variety mineral to extract from it whatever valuable minerals it may contain. The question of whether or not the extraction process can/would be profitable is not the ultimate question to be answered but it does aide [sic] in determining whether or not the rock on a particular piece of lease land is valuable mineral or common variety mineral. The State Land Department determined based on the facts presented to it, that the mineral to be mined was common variety mineral. There were facts presented upon which that finding could be made. Having determined that the proposed operation would be using common variety mineral and not valuable mineral, the State Land Department could and did properly find the proposed operation exceed the permission granted by the lease.

The court entered judgment in favor of the Department, and Peeples timely filed this

1. A topographic map of the property.
2. Proposed periods of operation.
3. A description of access routes.
4. A description of the types of vehicles to be used in mining operations.
5. Information sufficient to describe the development and mining activities, including the types and extent of mining operations to be performed on the leased property and an estimate of acreage to be disturbed.
6. An identification of any proposed exploration sites to be made on the map required by paragraph 1 of this subsection.
7. A summary of planned drilling operations, including ground elevation and total depth of planned drill holes.
8. A description of anticipated water use on the lands covered by the lease.
9. Information sufficient to describe planned reclamation activities.

appeal. We have jurisdiction pursuant to A.R.S. § 12–2101(B)(1994).

## ISSUE

¶ 13 Did the Department arbitrarily, capriciously, and contrary to law disapprove of Peeples' plans of operation and prohibit Peeples from extracting leasable minerals from the leased land?

## DISCUSSION

### Standard of Review

¶ 14 This is an appeal from a judgment of the superior court on judicial review of a final decision of the Department. On appeal, this court "must consider ... whether the agency's action was illegal, arbitrary, capricious or an abuse of discretion," and must affirm if it was not. *Lathrop v. Arizona Bd. of Chiropractic Exam'rs*, 182 Ariz. 172, 177, 894 P.2d 715, 720 (App.1995). In administrative review actions, this court independently reviews questions of law. *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prod., Inc.*, 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App.1990). We examine factual determinations to determine if there is substantial evidence in the record to support the agency's decision. *Id.*

### Disapproval of Peeples' Plans of Operation

¶ 15 The Department disapproved of Peeples' plans of operation on the basis that they proposed to "min[e] tailings which contain[ed] no economically recoverable mineral values and pursuant to A.R.S. § 27–271 [were] common variety minerals not subject to disposal under Mineral Lease Agreement 11–86475 and state law." The Mineral Lease, the applicable statute (A.R.S. § 27–235(B)(1), now § 27–235(C)(1)) and the regulations (Arizona Administrative Code ("A.A.C.") R12–5–1805(B)(1)) under which the Lease was issued, all "confer the right ... to extract and ship [leasable] minerals from [the leased land]." None of these authorities permit the Department to prohibit Peeples from extracting leasable minerals from any substance on the leased land, nor does any provision condition the right "to extract and ship minerals" upon a continuing profit being made throughout the lease term. Accordingly, we conclude the Department had no authority to prohibit Peeples' production of leasable minerals from the tailings on the leased land.

¶ 16 Once a mineral lease is issued, there is no statutory source that authorizes the Department to disapprove plans of operation based on leasable minerals being contained in other substances, or based on the Department's opinion that a lessee cannot make a profit from its mining operation. The relevant statutes in effect when the Lease was issued (A.R.S. §§ 27–231(A), 27–233) and the statute presently in effect (A.R.S. § 27–254) provide for only one occasion when the Department determines whether the state lands to be leased contain a "valuable mineral deposit." That occasion is *before* a mineral lease is issued. A.R.S. § 27–254. Similarly, the regulations only provide for submission of mineral value information to the Department and the Department's evaluation thereof *prior* to issuance of the lease. A.A.C. R12–5–1905.

¶ 17 After the Department has issued a lease, there is *no* authority in the mineral leasing statutes or regulations (or in the Lease itself) for the Department to re-test the land during the term of the lease and redefine the minerals as valuable or common variety, or for the Department to otherwise terminate the lease due to its determination of profitability. Rather, the statutes provide that "[e]very mineral lease of state lands shall be for a term of twenty years" and during that time, the lease "shall confer [upon the lessee] the right ... [t]o extract and ship minerals from the leased land...." A.R.S. § 27–235(B), (C)(1); *see also* A.A.C. R12–5–1805(B)(1).

¶ 18 The Department contends that it has the ability to disapprove Peeples' plans of operation pursuant to (1) its general authority under A.R.S. § 37–102(A)(1993 & Supp.2002) to administer state trust lands, (2) its general authority under A.R.S. § 37–211(A)(4)(1993) to investigate and obtain information in aid of administering those lands, and (3) its general authority under A.R.S. § 27–239(B)(2)(2000) to enter onto land under a mineral lease to "ascertain compliance

with law and the terms of the lease." None of the aforementioned statutes specifically authorize the Department (or the Commissioner) to disapprove a plan of operation during the term of a mineral lease on the grounds that the leasable minerals are contained in other material or that the mining operation may prove unprofitable. Rather, as noted, the *only* time the mineral leasing statutes authorize the Department to evaluate mineral character or mineral value is *before* the lease is issued. A.R.S. § 27–254. There is no other juncture, whether during the pendency of a lease or in conjunction with a general mining plan, that the statutes authorize the Department to make such a determination. An administrative agency may not carry out enforcement actions that are not authorized by the express provisions of its enabling statutes. *Arizona State Bd. of Regents ex rel. Arizona State University v. Arizona State Personnel Bd.*, 195 Ariz. 173, 175, ¶ 9, 985 P.2d 1032, 1034 (1999) ("Administrative agencies have no common law or inherent powers—their powers are limited by their enabling legislation.").

¶ 19 The Department also cites an uncodified Session Law (Laws 1998, Ch. 133, § 24(D), printed in the note following A.R.S. § 27–235) as authority to disapprove the plans of operation because it determined that the tailings essentially were common variety minerals. The referenced Session Law lists nine specific items of information that the Department may require for approval of a general mining plan. *Id.* Peeples provided all the requisite information in its 2000 plan of operation. The Session Law does not permit the Department to disapprove a general mining plan because leasable minerals are contained in other material or because of profitability concerns. The legislature clearly could have included such criteria had it so desired. *See State v. Roscoe*, 185 Ariz. 68, 71, 912 P.2d 1297, 1300 (1996) (fundamental principle of statutory construction is that exclusion of item from a list in a statute indicates an intent to exclude all items of the same class not expressed).

¶ 20 The Department further asserts that a general provision in the Session Law allowed it to go beyond the specific reasons listed in the statute for which it may deny a plan of operation, and to deny those plans if they are inconsistent with any of the state mineral licensing statutes. Specifically, the Department relies on Section 24(D) which provides, in pertinent part, that the Department:

> may disapprove a new or modified general mining plan ... if it is inconsistent with a requirement of title 27, chapter 2, article 3, Arizona Revised Statutes.

*See* Historical Note following A.R.S. § 27–235. The Department notes that the definition of "mineral" for purposes of title 27, chapter 2, article 3, specifically excludes "common variety minerals." A.R.S. § 27–231. Accordingly, it contends that because its testing indicated that the tailings were essentially common variety minerals, it properly disapproved the plans of operation because Peeples sought to process an impermissible material, namely common variety minerals.

¶ 21 This argument is flawed because the proposed plan of operation did not seek to process an impermissible material (i.e., common variety minerals). Rather, the plan of operation sought to further process leasable minerals on the land through improved mining techniques. That being so, there was no basis for the Department to disapprove the new mining plan as the plan was consistent with the terms of the Lease and applicable law. The Department's argument hinges on its ability to re-test the minerals mid-lease and redefine their nature or recalculate the value of the mineral deposit at issue. As discussed, nothing in this Session Law or any other statute authorizes the Department to make such determinations mid-lease.

¶ 22 The Department asserts that such a re-examination of a mineral deposit is supported by federal law, and that this court should follow federal precedent as Arizona courts have construed our state's mining laws in conformity with the laws and policies governing public lands of the United States. *See State Land Dep't v. Tucson Rock & Sand Co.*, 107 Ariz. 74, 78, 481 P.2d 867, 871 (1971). Specifically, the Department relies on the federal prudent man/marketability test that

applies to unpatented mining claims on federal lands.

¶ 23 Under federal law, an unpatented mining claim gives the claim-holder the right to occupy the federal land for purposes of removal of valuable minerals as long as those minerals continue to exist. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963). The administering agency however may challenge a once-valid mining claim at any time by applying the federal prudent man/marketability test to determine whether the mineral deposit has been depleted to such an extent that it is no longer valuable. *Chrisman v. Miller*, 197 U.S. 313, 322, 25 S.Ct. 468, 49 L.Ed. 770 (1905). The "prudent man" test requires a showing that there is sufficient valuable mineral remaining on the land that "a person of ordinary prudence would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a mine." *Id.* Generally, the test is met if the mineral can be removed and marketed at a profit. *United States v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 20 L.Ed.2d 170 (1968).

¶ 24 Because unpatented mining claims on federal land are distinguishable in several aspects from mineral leases on state trust lands in Arizona, we are disinclined to apply the prudent man/marketability test to a state mineral lease. First, federal regulations specifically authorize such mining claim examinations at any time to determine whether the minerals in the claim may still be marketed at a profit. 43 C.F.R. §§ 3809.100, 6304.12. In contrast, as discussed, there is no authority under the Arizona statutes or regulations for such a mid-lease evaluation of a mining operation's profitability. Second, federal law does not require proof of a profitable mineral discovery as a prerequisite for obtaining a federal unpatented mining claim. *See* 30 U.S.C. § 22 ("all valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration and purchase"). Such proof is a prerequisite to the issuance of a state mining lease. A.R.S. § 27–254.

¶ 25 The ongoing monitoring of a federal mine's continued viability makes sense because federal unpatented mining claims are for an unlimited duration and a claimant can acquire a patent (fee title) from the federal government upon proof of a profitable mineral discovery. 2 Am. L. of Mining § 36.01 (2d ed.1984). Such monitoring of an Arizona mineral lease is unnecessary as state mineral leases are for a limited term and lessees may not acquire title to the land. Therefore, there is no reason to examine the profitability of a mineral discovery during the term of an Arizona mineral lease.

¶ 26 We are also unpersuaded by the underlying premise of the Department's position. The crux of the Department's case is that the amount of the leasable minerals in the tailings Peeples seeks to process is so minimal, the tailings really constitute common variety minerals not subject to processing under the Lease or state law. In particular, the Department characterizes the tailings as "waste rock," an item expressly categorized as a common variety mineral under the statute. A.R.S. § 27–271(1).

¶ 27 While there may be waste rock in the tailings, the evidence does not support the conclusion that the tailings are composed solely (or even primarily) of waste rock. The tailings are material discarded during the initial mining process, i.e., they are actually "waste" not "waste rock." "Waste" is defined by the *Dictionary of Mining, Mineral and Related Terms* as "the part of an ore deposit that is too low in grade to be of economic value at the time of mining, *but which may be stored separately for possible treatment later.*" (Emphasis added). In contrast, "waste rock" is defined as "barren or submarginal rock or ore that has been mined, but is *not of sufficient value to warrant treatment and is therefore removed ahead of the milling process.*" (Emphasis added). As the Department itself recognizes, the tailings are not "waste rock"; rather, they contain a variety of material, including leasable minerals. We note that under the federal Common Varieties Act, common variety mineral deposits that contain leasable minerals are not characterized solely as common variety minerals, but may be processed pursuant to a leasable mineral lease. 30 U.S.C. § 611. In *Tucson Rock and Sand,*

our supreme court referred to this statute when noting that our courts would construe our mining laws in conformity with the laws and policies governing federal lands. 107 Ariz. at 78, 481 P.2d at 871.

¶ 28 The Department argues that it is not attempting to reevaluate the mineral deposit mid-lease. Instead, it claims that it should be able to perform a new assessment of the mineral value of the leased land because the land has already been mined, and Peeples' proposal to reprocess the tailings goes beyond the confines of permissible mining under the initial Lease. As noted by both Peeples and amicus Arizona Mining Association, however, it is a common practice in the mining industry to rework tailings to recover minerals previously missed. Eunice A. Eichelberger, Annotation, *Mine Tailings as Real or Personal Property*, 75 A.L.R.4th 965 (1990); 1 Am. L. of Mining § 1.02[2] n. 7 (2d ed.1985). Such reworking of tailings by the lessee to reclaim minerals previously rejected is appropriate as advances are made in mining techniques and equipment allowing capture of minerals that could not be separated and recovered during earlier, more rudimentary processing. 75 A.L.R.4th at 970.

¶ 29 The Department has failed to demonstrate that it had authority to reevaluate the value of the mineral deposit mid-lease or to prevent Peeples from reworking the tailings to obtain leasable minerals discarded during the initial processing. Moreover, nothing in the mineral leasing laws allows the Department to terminate a lease or disapprove a plan of operation on the ground that it appears unprofitable. Such a provision would potentially wreak havoc with mineral leases given that mineral prices can fluctuate widely over time and, during a downturn in prices, companies sometimes operate at a loss.

¶ 30 Mining companies make large investments in equipment and technology to extract minerals from leased land. If the Department were able to reevaluate the minerals and rescind leases or suspend mining operations on the basis that mining was unprofitable, it would effectively nullify these leases and may eliminate any incentive to mine on state land. Finding no statutory or regulatory authority, we conclude that the Department arbitrarily, capriciously and contrary to law disapproved of Peeples' plans of operation and prohibited Peeples from extracting leasable minerals from the leased land.

¶ 31 Peeples has also presented an equal protection violation argument. However, due to our previous discussion and reasoning, we do not address that contention.

## CONCLUSION

¶ 32 Lessees under state mineral leases have the right to mine and extract valuable minerals from leased land during the term of the lease. The relevant statutes and regulations, as well as the Lease at issue, give Peeples this right. The criteria for approval of general mining plans of operation do not give the Department authority to reevaluate the mineral character of leases for economic reasons. Accordingly, we reverse the judgment of the superior court affirming the Department's decision and remand this case for entry of judgment in favor of Peeples.

CONCURRING: ANN A. SCOTT TIMMER, Presiding Judge and G. MURRAY SNOW, Judge.